J. C. MOORE, et al. v. ED. MINNIS.

Eastern Section. June 15, 1929.

Petition for Certiorari denied by Supreme Court, December 21, 1929.

Fowler & Fowler, of Knoxville, for appellants.
Green, Webb & Bass, of Knoxville, for appellee.

THOMPSON, J. Complainant, J. C. Moore, owned a lot in Knoxville, fronting ninety-six feet on the east side of Gay street, and extending back eastwardly one hundred forty-six and one-half feet. There were two old houses on this lot fronting on Gay street.

On May, 28, 1907, Moore and wife leased this property to the Equitable Realty Association, a corporation, for a period of ninety-nine years at a rental of $240 per year, payable semi-annually; the lessee to pay taxes, insurance, cost of repairs, etc. The lease gave the lessee the right to alter or tear down the houses on the lot and the right to build others, etc., but required that at the expiration of the lease there be houses and improvements on the lot at least equal in value to $4000, and that they should be and become the property of the lessor. It is clear that the basis upon which the lease was drawn was that the property was worth $4000, and that the lessor (Moore) was to receive six per cent net on it per year.

The Equitable Realty Association built three small dwelling houses on the rear end of the lot, and added another floor or story to one of the houses on the front end and a basement and some rooms to the other.

On October 22, 1925, the Equitable Realty Association sold and assigned the lease to the defendants, Ed Minnis and Samuel Minnis.

On April 18, 1928, the complainants, Moore and wife, filed the bill in this cause against said defendants, Ed Minnis and Samuel Minnis, to have said lease forfeited and cancelled, and the possession of the property restored to them.

On the final hearing the Chancellor dismissed complainants' bill at their cost and they have appealed to this court and have assigned errors.

The material allegations of the bill are as follows:

"Complainants allege that at the present time, and for may years heretofore, upon the above described premises several wooden frame houses have been situated, that these houses are all old and dilapidated, that they were built at a time when builders of houses were not skilled in erecting structures with adequate provision against fire, that their condition makes the danger of fire imminent, and that these houses have for many years constituted and do now

constitute a nuisance within the meaning of the above quoted provision.

"The complainants further allege that at least one of the houses upon said premises is now, and for many years has been a notorious establishment for the illegal sale of intoxicating liquor in violation of State and Municipal laws and ordinances; that said house has often been raided by the city police and other law enforcement officers, and liquor unlawfully kept therein has been seized, and its occupants have been indicted, convicted and fined.

"Complainants further allege and aver that the said houses situated upon the described premises are now and have been used as resorts for gambling and other immoral purposes in violation of State and Municipal laws and ordinances; and that because of the practices carried on in said houses and the uses to which they are put and the fire hazard incident to the manner in which said houses are kept, a nuisance has been established and is being maintained by defendants upon said premises."

The material provisions of the lease are as follows:

"And the party of the second part (Equitable Realty Association) further agrees to comply at all times with all State and municipal laws and ordinances, and not to erect or cause to be erected, or permitted to be erected on the premises, any nuisance or to commit any waste.

"It is further stipulated between the parties to this contract that if the party of the second part, its successors and assigns, shall fail . . . to do and perform any of the covenants and obligations imposed upon it by this contract, then the parties of the first part, their heirs and assigns, at their election, may declare this lease forfeited and at an end, and may re-enter and take posession of the said property.

"And the parties of the first part further grant and convey unto the party of the second part, the full right and power to assign this lease, or sublet the said property or any part thereof, for any terms of years less than the period for which this lease is made, but such assignment or subletting shall depend upon and be subject to the terms, provisions, stipulations, conditions and obligations of this contract."

We might state here that there was no effort upon the part of the complainants to show that the houses on the lot had become so dilapidated as to constitute a nuisance or fire hazard, etc. The uncontradicted proof shows that the houses were kept in good repair and were in better shape than when the lease was executed.

The lot in question fronts ninety-six feet on the east side of Gay street but is at the end of the bridge across the Tennessee river and is below the level of said bridge. The two houses fronting on Gay

street are frame and old and the lower floors are below the level of the bridge. The three houses on the rear end of the lot are frame and cheap. They have only two or three rooms and are what are known as "shot-gun" houses. None of the houses could be rented to any other than a very poor class of tenants.

In 1904, the complainant, J. C. Moore, had a stroke of some kind, and since then he has been compelled to use crutches in order to walk. He can get around very little, and lives more than a mile from the property in question. On account of his physical condition he did not visit the property.

The Equitable Realty Association was a corporation which seems to have been controlled by S. R. Rambo. It dealt in real estate and rentals and Mr. C. B. Johnson did its collecting on the rental property, and was, of course, collecting the rentals from the various tenants in the houses in question at the time the Equitable Realty Association sold and assigned the lease to the defendants. Mr. Johnson seems to be an honorable and upright man, and a member of the Knox County Revenue Commission, whose office is in the Court House. After the sale and assignment of the lease to the defendants he continued doing the collecting, but of course turned the money over to the defendants.

The defendants live at New Market, some thirty miles from Knoxville, where they operate a large store, and they seldom went to Knoxville and inspected their property. They are most honorable and upright men, and are staunch prohibitionists. At the time they purchased the lease in question they also bought other leases and property in Knoxville from the Equitable Realty Association—for all of which, including the lease in question, they paid $30,000. The lease in question was not valued or appraised separately from the other property and leases which they bought, but the evidence shows that its value at the time was about one-third of the total of $30,000, which they paid, i. e. $10,000.

As stated, Mr. Johnson, continued collecting the rent on the houses on the lot covered by the lease in question, as well as on the other leases and property which the defendants bought from the Equitable Realty Association, and they left in his hands the matter of keeping said houses rented. When a house would become vacant he would simply rent it to some one else without reporting to the defendants to whom he had rented it. They did not know who were occupying the houses and had no knowledge whatever of their tenants. They simply trusted all of this to Johnson. When repairs would be needed on any of their property in Knoxville Johnson would so report to them and they would have their carpenter, a Mr. Carmichael, who had been doing their work for nearly

thirty years, make the repairs with the assistance of whatever other carpenters, etc., he might need.

There lived in Knoxville a family by the name of Hankins. They seemed to have had an unsavory reputation, and most of them seem to have been law violaters of one kind or another. One of the girls, Ina Hankins, married a man by the name of Walter Pressley, and whose nick-name was "Baldy." Pressley seems to have been a bootlegger and was tried and convicted several times. On July 11, 1924, Pressley was sentenced to serve two years in the Federal prison at Atlanta, Georgia, for violating the Harrison Anti-Narcotic Act. While he was serving this time Ina divorced him and married Roy Kirby who also engaged in bootlegging operations.

In January, 1926, Roy Kirby pleaded guilty and was sentenced to serve one year and one day in the Federal prison for possessing' liquor in violation of the National Prohibition Act. Shortly thereafter Ina Kirby rented (of course through Mr. Johnson) the upper floor or apartment of the large double house which fronted on Gay street. At that time Johnson did not know her husband, Roy Kirby, who was then in the penitentiary. He knew Ina, but knew very little about her. There is evidence tending somewhat to show that some man lived in the apartment with Ina Kirby until Roy got out of the penitentiary, but when he did get out he went to the apartment and lived with her—the man, if any, in the meantime, having left. Some time thereafter a man by the name of Teefeteller rented (through Johnson) the lower apartment or rooms in the said larger or double house, which fronted on Gay street. He lived there for several months. About July, 1926, Pressley, having been discharged from the penitentiary, rented (through Johnson) a room or rooms in one of the small shot-gun houses in the rear, and lived there for several months.

Teefetcller was a partially disabled war veteran who was only able to work a part of the time. While he was living in the said lower apartment he became intoxicated on one occasion, engaged in a fight on the sidewalk near the property and was arrested. Also while he was living in said lower apartment the police searched it on one occasion and found five or six pints of liquor. If he bought this liquor with the idea of selling it, it was evidently his first and only offense while he was living in the apartment, and he moved away shortly thereafter. The proof as a whole indicates that he was not a bootlegger or habitual law violator, and there was nothing in his occupation of said lower apartment which would justify a court in decreeing a forfeiture of the lease.

While Pressley was occupying a room or rooms in one of the shot-gun houses on the rear of the lot, the police on one occasion became suspicious that Ina Kirby (his former wife) was storing

her liquor in his rooms, and they raided his rooms and found a quart of whiskey. He moved out shortly thereafter. He had been a law violator and had been tried and convicted several times before he moved into the shot-gun house, but the finding of the above mentioned quart is the only time that he was shown to have violated the law while he lived on the premises in question, and as stated, he moved away shortly thereafter.

On one occasion the police raided one of the shot-gun houses in the rear and in which a woman by the name of Llewellyn was living. They found a man with her and arrested them both. She moved out shortly thereafter.

On another occasion the police raided another of said shot-gun houses in which a woman by the name of Runyon was living. They found a man with her and arrested them. It is not clear whether this Runyon woman continued thereafter to live in the house, but if so the above was her only offense.

We might state here that the proof as a whole clearly indicates that none of the houses were operated or used as bawdy or assignation houses, etc., and laying aside for the present the doings of Roy and Ina Kirby in the upper story or apartment of the double house, we are of the opinion that there was nothing that took place in any of the houses that would justify a decree forfeiting the lease.

As hereinbefore stated, Ina Kirby rented and moved into the upper apartment of the double house during the early part of 1926, and her husband, Roy Kirby, joined her as soon as he got out of the penitentiary. Undoubtedly, Roy and Ina engaged in bootlegging operations in said apartment. On one occasion the police raided the apartment and found a small quantity of whiskey, but it seems to have belonged to Ina's brother, Fred Hankins, who was present and claimed it. Only Fred was arrested. On another occasion the police raided the apartment and found a quart of whiskey which belonged to one Dalton, who was present and claimed it. Only Dalton was arrested. On still another occasion the police raided the apartment and seem to have caught Ina with a mixture of whiskey and water in her hands, but the proof is not very clear as to this. On still another occasion some officers raided the apartment and caught several people there gambling with dice. However, the proof as a whole indicates that very little gambling went on in the apartment. The police officers testified that they raided the apartment, a number of other times but were not able to catch any liquor; that there was a very heavy, strong door to the apartment and that Ina and Roy would manage to pour their liquor into the sink before they (the officers) could get in. They said that when they would get in they could smell the liquor and see the

bottles, fruit jars, corks, etc., but were not justified in making arrests on that kind of evidence.

About the first of January, 1928, or perhaps a short time prior thereto, the complainant, Moore, by reading the newspapers and hearing rumors, etc., became aware, or at least became of the opinion, that Roy and Ina were in the property and were carrying on bootlegging operations there, and had been arrested, etc. A new seventeen story hotel building had been constructed within 150 feet of the lot, and it had been publicly announced that the Elks would construct a handsome home just across the street from the lot—all of which increased the value of said lot and houses thereon.

Shortly prior to April 16, 1928, a real estate firm in Knoxville, Dooley & Gillespie, thought that they had a sale for the property and they requested Johnson to get options on it from Moore and the Messrs. Minnis covering their respective interests. Johnson went to see Moore and sought to get an option on his interest. Moore stated that he had not been treated right when the Equitable Realty Association sold the lease to the Messrs. Minnis; that they should have first offered the lease to him; that if the Messrs. Minnis should sell the lease for a large price that he ought to receive one-half of the profits; and that he would not give an option on his interest.

In a few days thereafter Moore went to New Market and called upon Messrs. Minnis with the idea of getting together with them on a sale of the property. It is not entirely clear just what occurred on this call, but the Messrs. Minnis declined to deal with him. But Moore said nothing whatever about having heard that bootleggers and law violators had or were occupying the houses on the lot. Nor had he said anything about that to Johnson.

On April 16, 1928, Moore and wife wrote a letter to Messrs. Minnis stating that it had recently come to their attention that the premises were occupied by bootleggers, etc., and had also become a menace to the surrounding property because of their liability to destruction by fire, and that "we elect to declare the same (the lease) forfeited and at an end; and you are hereby notified to vacate said premises as it is our intention to re-enter and take possession of the same in accordance with the terms of said lease."

On the next day, i. e., April 17, 1928, Messrs. Minnis answered the letter and among other things said:

"This is to inform you that you have no right to declare the lease forfeited, and that we decline to vacate the said premises, and that you have no right to re-enter and take possession thereof.

"We have paid the taxes promptly as they fell due, and we have paid you the rent promptly as it fell due and you accepted it, and if you had any ground of forfeiture you waived it.

"The notice in your letter in regard to the alleged nuisances, etc., upon the said premises, is the first information or intimation we have ever received of such a thing, and we do not know whether it is true or not. But we will at once have an investigation made and if we find that the conditions exist that you speak of, we will have them remedied."

On the same day, i. e., April 17, 1928, Messrs. Minnis wrote letters to the chief of police of Knoxville and the sheriff of Knox county asking them to make an immediate and thorough investigation of the premises and to eject any person or persons who might be using the houses for illegal or immoral purposes. Messrs. Minnis also instructed Johnson to eject Roy and Ina Kirby, and he filed an unlawful detainer suit against them and put them out.

Nevertheless, on April 18, 1928, complainants filed the suit in this cause.

It is entirely clear from the record that until Messrs. Minnis received the complainant's letter of April 16, 1928, they never had the slightest idea or even suspicion that any violations of law were taking place in the houses. But complainants insist that Johnson knew of it and that Messrs. Minnis are chargeable with his knowledge.

The only evidence that any one ever notified Johnson that any violations of law were taking place in the housing is the following from the testimony of policeman Clifton who had raided the Kirby apartment:

"Q. When you made these raids did you know who owned the property in question, Mr. Clifton? A. Well, I will tell you, one time when I was on the beat I asked the gentleman there, the agent of it, or the owner of it, somebody, I asked him to get rid of the people down there, it looked like a regular nuisance.

"Q. Who was that? A. I forgot his name; he worked at the Court House; I understood he was in charge of the rents, collecting the rents on the property, and I went to him.

"Q. What did he say? A. He promised me he would get rid of them.

"Q. Did he? A. I don't know; I went off the beat."

It will be observed that Mr. Clifton did not definitely identify Johnson as the man he talked to. Nor did he say that he told Johnson that the Kirbys or any of the other tenants were engaged in bootlegging operations in the houses, etc. He simply said that he asked the man he talked to, "to get rid of the people down there." And Johnson testified that he had no recollection of Mr. Clifton or any one else ever talking to him about the tenants, tell-

ing him that they were bootleggers or advising him to get rid of them, etc.

At the time Johnson rented the apartment to Ina Kirby he knew her only slightly, and knew nothing about her. He did not then know Roy Kirby at all. Ina is shown to be a woman of ordinary appearance. Roy is described as a man of neat appearance. The police officers say that they never knew or heard of either Ina or Roy becoming intoxicated. It is true that Johnson went to the Kirby apartment each week to collect rent, but for all that appears in the record he did not go inside of the apartment. Certainly it does not appear that he went into the kitchen where they kept their liquor. The fact that the police officers could smell liquor when they raided the apartment—the liquor having just been poured into the sink—does not show that Johnson could smell liquor when he merely went to the apartment to collect rent. The fact that he probably saw some fruit jars around the premises would not necessarily charge him with notice that bootlegging was going on there. Many people still use fruit jars for legitimate purposes, and no doubt many people who drink liquor but do not sell it sometimes have fruit jars on their premises.

The most that the record shows is a situation such that it would seem probable that Johnson would be aware that violations of law were taking place in the houses—particularly in the Kirby apartment. But it should be remembered that this is a low class of property due to its location and that only a low class of tenants can be procured for it, and the situation which was shown to have existed is not sufficient to overcome Johnson's positive testimony that he did not know or suspect that violations of law were taking place in the houses.

Messrs. Minnis are high class law abiding men and strong prohibitionists. They are shown to be as much, if not more, interested in keeping the houses free from tenants who violate the law therein as the complainants are. At the very first notice that law violations were going on in the houses they took immediate steps to and did remove the objectionable tenants. They have paid about $10,000 for this lease, and the complainants' reversionary interests have not been damaged. The property has been increased in value by the erection of extremely expensive and handsome improvements near it, and when we take into consideration the fact that after Moore had notice of law violations in the houses he discussed with both Johnson and the Messrs. Minnis a sale of both interests in the property without even mentioning said law violations, etc., and the fact that he hurriedly brought this suit before Messrs. Minnis had time to do very much toward cleaning up the situation, we are forced to the conclusion that he is simply trying to

use the said law violations as a sword with which to free this valuable property from the lease which he and his wife executed, and to thus reap the pecuniary benefits of the nearby improvements.

The lease merely provides that, "the party of the second part further agrees to comply at all times with all State and municipal laws and ordinances, and not to erect or cause to be erected, or permit to be erected on the premises, any nuisance or to commit any waste."

Equity does not favor forfeitures and the courts are entitled to use some discretion as to whether or not a forfeiture will be decreed. In view of all the facts and circumstances in this case we do not think that a forfeiture should be decreed.

It results that in our opinion there was no error in the decree of the lower court and the same will be affirmed, with costs.

Portrum and Snodgrass, JJ., concur.